[No. B178701. Second Dist., Div. Four. Feb. 24, 2006.]

NORMAN FRITZ, Plaintiff and Appellant, v.
SANFORD M. EHRMANN, Defendant and Respondent.

1376

**COUNSEL**

The Mentislaw Group, Dianna M. Worley and Diane L. Mancinelli for Plaintiff and Appellant.

Meyers & McConnell, Frederick S. Reisz and Jeffrey Francis Allen for Defendant and Respondent.

**OPINION**

**CURRY, J.**—Attorney and respondent Sanford M. Ehrmann was sued by his former client, appellant Norman Fritz, for malpractice in connection with a promissory note prepared by Ehrmann in 1995. The malpractice action was filed in 2003, approximately seven months after Ehrmann was replaced as counsel in litigation that ensued over an ambiguity in the note. The court granted Ehrmann's motion for summary judgment on statute of limitations grounds, ruling that the statute accrued and ran on the malpractice action many years before Ehrmann began to represent Fritz in the prior litigation. We conclude that the facts do not indisputably show that the statute accrued until shortly before the prior litigation commenced. We further hold that the statute was tolled while Ehrmann represented Fritz in that litigation under the continuous representation tolling provision of the attorney malpractice statute of limitations. Accordingly, it was error to rule that the statute of limitations barred the action as a matter of undisputed fact. We reverse and remand for further proceedings.

### FACTUAL AND PROCEDURAL BACKGROUND

*The Underlying Malpractice Complaint*

On November 20, 2003, Fritz brought suit against Ehrmann. The complaint alleged that Ehrmann committed legal malpractice in 1995, when Fritz

retained him to negotiate and draft a promissory note made payable to Fritz with third parties Shirish, Pushpa, Arun, and Priti Patel (the Patels) as the payees or "maker." According to the complaint, Ehrmann failed to exercise reasonable care and skill in performing legal services in connection with the note.

### Motion for Summary Judgment

Ehrmann moved for summary judgment. Comparing the parties' competing statements of facts establishes that the following facts were undisputed by either side: In 1983, Fritz sold a motel to the Patels in return for a promissory note secured by a deed of trust in the amount of $729,895, with interest at 10 percent. The note called for interest only payments, and for the principal to be due and payable at the end of the note's 20-year term. In addition, for the first five years, one-half of the interest was to be deferred and paid at the end of the note's term.[1] The amount of deferred interest that accrued under this provision was $182,474.

The original note stated that the maker "reserves the privilege of making principal reduction payments in whole or in part at any time without penalty." In September 1995, Fritz entered into an oral agreement with the Patels whereby they agreed not to prepay the note in exchange for a reduction in interest from 10 percent to 8 percent. Fritz then asked Ehrmann to prepare a new promissory note to reflect the parties' understanding. Ehrmann had been Fritz's lawyer for many years and had represented him with respect to numerous matters.[2] The second note prepared by Ehrmann contained the new interest rate, but was silent as to the deferred interest and contained the same provision as in the original note allowing the Patels to prepay principal.[3] The entire principal sum continued to be due on September 1, 2003. The Patels executed the second note in or around September 1995.[4]

---

[1] The precise terms were as follows: "Commencing October 1, 1983, and continuing on said day of each and every month for a period of five years, monthly INTEREST ONLY payments to be at ten percent (10%) per annum, with one-half of said ten percent (5%) interest deferred to the due date of the Note. . . . Said earned but deferred interest shall be added to the principal balance of the Note but shall not bear like interest. Therefore, for the first five years of the term of this Note, interest only payments shall be computed at 5% per annum, as stated above, 5% per annum interest deferred to the due date of the Note."

[2] Ehrmann stated at his deposition in August 2003 that he had been Fritz's personal attorney for 40 years.

[3] The September 1995 note stated that it was "a replacement for Note, dated August 26, 1983 in the same principal sum between the same parties" and that its purpose was "to reduce the interest rate effective October 1, 1995 to 8% (eight) per annum."

[4] Ehrmann attempted to establish as an undisputed fact that he had transmitted the note to Fritz and asked him to "triple-check" it for accuracy. However, Fritz presented evidence in his

The Patels made monthly interest payments on the second note until November 2000. At that time, they submitted a partial prepayment of principal in the amount of $200,000, which Fritz accepted. In August 2001, the Patels proffered a second partial repayment of principal in the amount of $279,895. Fritz accepted that payment as well. In January 2002, the Patels made their self-described "LAST & FINAL PAYMENT" to "pay off note in full" via two checks—one for $250,000 and one for $1,128.96. Fritz accepted these checks. However, when the Patels requested a reconveyance of the deed of trust secured by the note, Fritz contended that they still owed him the deferred interest of $182,474.

The Patels brought suit to clear their title to the motel in June 2002. Appellant filed a cross-complaint seeking payment of the deferred interest. Ehrmann represented appellant in the lawsuit[5] until April 23, 2003, when a substitution of attorney was filed. The lawsuit was settled in October 2003, with the Patels agreeing to pay Fritz an additional $100,000 in return for reconveyance of the deed of trust. As we have seen, the underlying malpractice complaint was filed one month later. According to both parties' statements of undisputed facts, Ehrmann admitted that "he mistakenly failed to include provisions in the [second] Promissory Note regarding the deferred interest and precluding the Patels from making a pre-payment of principal" and "the [second] Promissory Note prepared by Ehrmann was allegedly deficient in that it still provided that the Patels could pre-pay, and was ambiguous with respect to the issue of the deferred interest."

The basis for summary judgment was that, despite the admitted deficiencies in the second note, the statute of limitations provided a complete defense. Ehrmann took the position that Fritz suffered actual harm either when the note was signed in 1995 or in November 2000, when the Patels prepaid some of the principal on the note. He argued that the statute of limitations accrued on the date of injury and that his representation of Fritz in the litigation with the Patels over the note until April 2003 was not continuous, as required to toll the statute. As Ehrmann saw it, by the time he agreed to represent Fritz in the litigation over the note, the statute of limitations had already expired.

In a declaration submitted in opposition to the motion for summary judgment, Fritz explained that when he accepted the first prepayment from

---

opposition that the letter from Ehrmann to Fritz attached to the moving papers which allegedly transmitted the note to him and contained this advice was actually sent in connection with a wholly unrelated matter.

[5] The precise date when Ehrmann began the representation is not clear from the undisputed facts, but there is a letter to Fritz from Ehrmann dated April 18, 2002, discussing the dispute with the Patels and expressing his intent not to charge Fritz any fees for representing him in connection with the matter.

the Patels, he did not know about the flaws in the promissory note and did not know that the Patels intended to object to paying the deferred interest. The prepayment came about because Shirish Patel called and asked permission to make an early principal payment, explaining that it would be a good idea for tax purposes. Fritz agreed to accept the payment on that basis.

In his reply, Ehrmann contended that Fritz's declaration was contradicted by a declaration he submitted in the Patel lawsuit. The referenced declaration primarily discussed the $182,474 in deferred interest, which appears to have been the focus of the Patel lawsuit. In refuting the argument that he had intended to waive payment of the deferred interest in the agreement that preceded the September 1995 note, Fritz had stated: "There would be no reason in the world for me to reduce the interest rate [in 1995] and do away with $182,474 in principal that was due to me, just to receive a prepayment penalty clause that I never received anyway. There was no tax savings to me to avoid payment in full on the NOTE in 1995 just to reduce the interest rate and give away $182,474 especially in light of the fact that the PATELS prepaid the MODIFIED NOTE anyway."

The court granted the motion for summary judgment, stating in its order that "[t]here is no triable issue of material fact with respect to when [Fritz] suffered actual injury." Judgment was entered, and this appeal followed.

## DISCUSSION

## I

Section 340.6 of the Code of Civil Procedure (section 340.6), the special statute of limitations for attorney malpractice actions, provides in pertinent part: "An action against an attorney for a wrongful act or omission, other than for actual fraud, arising in the performance of professional services shall be commenced within one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the facts constituting the wrongful act or omission, or four years from the date of the wrongful act or omission, whichever occurs first. In no event shall the time for commencement of legal action exceed four years except that the period shall be tolled during the time that any of the following exist: [¶] (1) The plaintiff has not sustained actual injury; [¶] (2) The attorney continues to represent the plaintiff regarding the specific subject matter in which the alleged wrongful act or omission occurred."

Because of the tolling provisions, it is often the case that neither the date the plaintiff acquires knowledge of wrongdoing nor the date of the wrongful act is meaningful in determining whether the statute of limitations has run.

Injury may not occur until much later, and attorneys, having been alerted to a potential mistake, generally will do all they can to rectify the matter by representing the client during any litigation that ensues.

For many years, the majority of courts believed that injury did not occur until settlement or entry of final judgment in any litigation that arose from or was related to the neglectful conduct. (See, e.g., *Karno v. Biddle* (1995) 36 Cal.App.4th 622, 629 [42 Cal.Rptr.2d 318].) The Supreme Court adopted such a rule for certain types of malpractice in *ITT Small Business Finance Corp. v. Niles* (1994) 9 Cal.4th 245 [36 Cal.Rptr.2d 552, 885 P.2d 965] (*ITT*), wherein the court held that "in transactional legal malpractice cases, when the adequacy of the documentation is the subject of dispute, an action for attorney malpractice accrues on entry of adverse judgment, settlement, or dismissal of the underlying action." (*Id.* at p. 258.) However, the holding in *ITT* was called into question by the court's later decision in *Adams v. Paul* (1995) 11 Cal.4th 583 [46 Cal.Rptr.2d 594, 904 P.2d 1205], which held that "[i]n the 'classic' missed statute situation, in which the attorney negligently fails to file the underlying lawsuit within the applicable statutory period and does nothing further, the plaintiff suffers actual harm at the time the statutory period lapses because, assuming the claim was otherwise viable, the right and/or remedy of recovery on the action has been substantially impaired." (*Id.* at p. 589.)

The Supreme Court recognized a discrepancy between the two holdings, and *ITT* was formally overruled in *Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739 [76 Cal.Rptr.2d 749, 958 P.2d 1062] (*Jordache*). In *Jordache*, the Supreme Court explained that the actual injury tolling provision contained in section 340.6, subdivision (a)(1) was derived from the case of *Budd v. Nixen* (1971) 6 Cal.3d 195 [98 Cal.Rptr. 849, 491 P.2d 433] (*Budd*), wherein the court had said: " 'If the allegedly negligent conduct does not cause damage, it generates no cause of action in tort. [Citation.] The mere breach of a professional duty, causing only nominal damages, speculative harm, or the threat of future harm—not yet realized— does not suffice to create a cause of action for negligence. [Citations.] Hence, until the client suffers appreciable harm as a consequence of [the] attorney's negligence, the client cannot establish a cause of action for malpractice.' " (*Jordache, supra,* 18 Cal.4th at pp. 749–750, quoting *Budd, supra,* 6 Cal.3d at p. 200.)

The court in *Jordache* further explained that: "The 'actual injury' provision in section 340.6, subdivision (a)(1), effectively continues the accrual rule *Budd* established. Under *Budd*, the cause of action could not accrue until the plaintiff suffered actual loss or damage resulting from the allegedly negligent conduct. [Citation.] After sustaining damages compensable in a

negligence action, the plaintiff could establish a cause of action for professional negligence, and the limitations period commenced. [Citation.] Under section 340.6, the one-year limitations period commences when the plaintiff actually or constructively discovers the facts of the wrongful act or omission, but the period is tolled until the plaintiff sustains actual injury." (*Jordache, supra,* 18 Cal.4th at p. 751.)

The court contrasted actual injury, which causes the statute to accrue, with speculative or contingent damage, which does not: "[S]peculative and contingent injuries are those that do not yet exist, as when an attorney's error creates only a potential for harm in the future. [Citation.] An existing injury is not contingent or speculative simply because future events may affect its permanency or the amount of monetary damages eventually incurred. [Citations.]" (*Jordache, supra,* 18 Cal.4th at p. 754.)

The facts in *Jordache* illustrate the Supreme Court's interpretation of the term "actual injury." The client in that case (Jordache) learned of a potential mistake made by its former attorneys (Brobeck) in December 1987 when new counsel explained that Jordache should have presented a claim to its insurers in 1984 after being sued for allegedly marketing counterfeit Guess? jeans. New counsel tendered defense of the action to Jordache's insurers in 1987. But one of the defenses raised by the insurers was untimely notice and substantial prejudice. The legal malpractice action against Brobeck was not filed until several years later, after Jordache settled the original action and received a partial reimbursement from a separate settlement with its insurers. At the time of the settlement, a ruling had been issued by the trial court stating that whether one of the insurers had been substantially prejudiced by the late notice was an issue of fact that could not be determined on summary judgment.

On these facts, Jordache argued that the statute of limitations did not accrue (or was tolled) until the insurers settled for a lesser amount than might have been obtained had the claim been presented in 1984. The Brobeck firm contended that that statute began to run in 1987, because by that time, Jordache had knowledge of the alleged mistake and had incurred actual injury in the form of monies used for defense costs in the underlying action that might otherwise have been paid by the insurers. The trial court agreed with Brobeck and entered judgment. The Court of Appeal sided with Jordache, and reversed.

█ The Supreme Court agreed with the trial court: "Actual injury refers only to the legally cognizable damage necessary to assert the cause of action. There is no requirement that an adjudication or settlement must first confirm a causal nexus between the attorney's error and the asserted injury."

(*Jordache, supra,* 18 Cal.4th at p. 752.) Instead, the court held, "[t]he test for actual injury under section 340.6" turns on the issue of "whether the plaintiff has sustained any damages compensable in an action, other than one for actual fraud, against an attorney for a wrongful act or omission arising in the performance of professional services." (*Id.* at p. 751.) Distinguishing between "an actual, existing injury that might be *remedied or reduced* in the future, and a speculative or contingent injury that might or might not *arise* in the future," the court concluded that Jordache sustained actual injury no later than 1987 because by then it had "expended millions of dollars to defend the [original] action and lost millions of dollars from profitable investments forgone to pay defense costs." (*Id.* at p. 754.) "These actual, existing injuries, and the diminution of Jordache's insurance policy rights the late tender occasioned, did not first arise when the coverage litigation was settled." (*Ibid.*)

The Supreme Court was clear in *Jordache* that "the determination of when attorney error has caused actual injury under section 340.6, subdivision (a)(1), cannot depend on facile, 'bright line' rules. [Citation.] Instead, the particular facts of each case must be examined in light of the wrongful act or omission the plaintiff alleges against the attorney." (*Jordache, supra,* 18 Cal.4th at p. 764.) The court stated that, generally, the facts and circumstances of each case must be analyzed by the trier of fact to determine when the plaintiff sustained actual injury. (*Ibid.*) However, "[w]hen the material facts are undisputed, the trial court can resolve the question as a matter of law . . . ." (*Ibid.*)

Applying these standards to the present case, it is apparent that there were two potential bases for injury to Fritz from Ehrmann's negligence in drafting the second note. First, he could have been injured by the Patels' prepayment of principal, assuming he could not thereafter reinvest the principal and obtain a similar rate of return. Second, he could have been injured by the failure to specify in the note that the deferred interest was to be repaid at the end of the term. Both injuries were speculative at the time of the preparation of the note. The Patels might never have had the funds or the inclination to prepay principal, and they might have paid the deferred interest in accord with the parties' original understanding without regard to any ambiguity in the second note.

Our conclusion that injury was still speculative and contingent in 1995 is supported by the Supreme Court's decision in *Adams v. Paul* in which it states that in some circumstances, "the actual loss of the underlying remedy may remain contingent, that is, the attorney's negligence may have created only the potential for future harm." (*Adams v. Paul, supra,* 11 Cal.4th at p. 590.) The court gave as an example an attorney's negligent preparation of trust documents, where damage did not occur " 'until the trust was challenged

and plaintiffs were force to pay legal fees to defend' [the documents]." (*Ibid.*, quoting *Horne v. Peckham* (1979) 97 Cal.App.3d 404, 417 [158 Cal.Rptr. 714].) Like the negligent preparation of trust documents, and unlike the failure to file a lawsuit within the statute of limitations, Ehrmann's alleged acts and omissions in 1995 may never have led to any harm. (See *Baltins v. James* (1995) 36 Cal.App.4th 1193, 1207–1208 [42 Cal.Rptr.2d 896] (*Baltins*) [date that husband, acting on advice of counsel, signed a quitclaim deed conveying community property of his first marriage to his second wife was not the date of actual injury for malpractice purposes; instead "it presented only a threat of future harm—not yet realized" because "[t]hat action created only a potential for adverse consequences" until "[the first wife] challenged the transfer and the trial court ruled against the [couple]"].)

Ehrmann takes the position that if summary judgment cannot be based on actual injury occurring in 1995, such injury occurred no later than November 2000, when the Patels asked for and received permission to prepay a lump sum of principal. Ehrmann avers that injury resulted because Fritz lost the right to collect additional interest on the prepaid principal. We do not agree either that Fritz necessarily suffered injury when some of the principal was prepaid or that injury from prepayment of principal caused the statute of limitations to run on the deferred interest claim. Fritz stated in his declaration that Shirish Patel sought and received his permission to submit the partial prepayment and that, at the time, both parties were operating under the assumption that prepayment was not permitted under the terms of the second note.[6] He stated that he decided to accept the partial prepayment after being persuaded there would be tax benefits to receiving the principal in increments over several years. If the facts are as Fritz contended, the partial repayment caused him no injury. The provision forbidding prepayment was for his benefit. If he chose to waive a provision both parties believed the note contained, he suffered no actual harm.

Ehrmann contends that Fritz's declaration submitted in opposition to the underlying summary judgment should be disregarded because it contradicted a declaration submitted in the Patel litigation. In the earlier declaration, he had stated: "There would be no reason in the world for me to reduce the interest rate [in 1995] and do away with $182,474 in principal that was due to me, just to receive a prepayment penalty clause that I never received anyway. There was no tax savings to me to avoid payment in full on the NOTE in 1995 just to reduce the interest rate and give away $182,474 especially in light of the fact that the PATELS prepaid the MODIFIED NOTE anyway." We do not agree that this prolix statement contradicts Fritz's underlying declaration. Ehrmann's interpretation is that Fritz was saying there was no tax

---

[6] After it was executed, the second note was placed in the hands of a third party responsible for administering and keeping track of the payments.

savings *at all* from avoiding payment in full in a single year. It seems more likely that he was trying to convey that there was no tax savings worth $182,474 *and* a reduced interest rate. In either event, the statement has no bearing on whether there were tax savings to be had by spreading principal payments out over three years rather than having to declare a lump sum as income in 2003. Moreover, even under the broadest interpretation, the statement only goes to Fritz's motive for waiving a prepayment prohibition that he and the Patels believed existed. He needed no reason to waive the provision, and the declaration from the Patel litigation did not contradict that Shirish Patel asked for and received permission to prepay, and that both parties believed permission was required under the terms of the second note.

Ehrmann also contends that Fritz's declaration was contradicted by his discovery responses in which he stated (1) that Ehrmann committed malpractice both by failing to account for the deferred interest and by failing to include the prepayment prohibition in the second note and (2) that he (Fritz) was entitled to recover from Ehrmann as damages interest on the $182,474 from the date of breach until the present "as well as interest on the amounts that should not have been pre-paid." The former is a simple statement of fact or at least of the facts as Fritz understands them. The latter appears to be an attempt to keep the issue of damages from prepaid principal alive without stating that there were any such damages. Neither is directly contradictory to the underlying declaration.

More importantly, the injury Fritz may or may not have suffered in November 2000 from the failure to amend the prepayment clause in the second note should be analyzed separately from the injury caused by the failure to account for the deferred interest. The deferred sum was not due until 2003, and Fritz purportedly had no reason to believe that the Patels would refuse to pay due to the omission in the second note until sometime after January 2002.

■  The trial court apparently believed that both injuries should be seen as one event. The notion that a time-barred portion of a malpractice claim should defeat the entire claim is not supported by any authority.[7] It was expressly rejected in *Baltins, supra,* 36 Cal.App.4th 1193. The plaintiff there had consulted the defendant attorney in 1983 in connection with the dissolution of his marriage. In 1984, he and his second wife (also a plaintiff)

---

[7] In *Crouse v. Brobeck, Phleger & Harrison* (1998) 67 Cal.App.4th 1509 [80 Cal.Rptr.2d 94] (*Crouse*), cited by Ehrmann, the court stated that "[n]othing in the summary judgment statute allows a single cause of action alleging legal malpractice to be separated into component acts with separate statutes of limitations running on each discrete act." (*Id.* at p. 1526, fn. 2.) However, the court further stated that this rule applied when "a cause of action for malpractice alleges a single injury . . . ." (*Ibid.*)

retained the defendant to oppose the first wife's motion to set aside the marital property division and support judgment. The second wife's motion was granted in 1984. The defendant initially continued to represent the plaintiffs during the appeal and postjudgment process. He gave them further advice about how to deal with the disputed property and the first wife's support claims pending resolution of the appeal. In 1985, the plaintiffs terminated the defendant. In 1989, the Court of Appeal affirmed the trial court's orders regarding the dissolution. Also in 1989, the first wife brought claims based on actions the plaintiffs had undertaken on the defendant's advice regarding putting the second wife's name on disputed property, and the plaintiffs incurred substantial attorneys' fees and other damages as a result. The couple filed a malpractice action against the defendant in 1990. The trial court sustained a demurrer on statute of limitations grounds to the plaintiffs' original complaint and to their first amended complaint.

On appeal, the defendant argued that all of the plaintiffs' damages flowed from the trial court's 1984 order, which had been alleged as a basis for the plaintiffs' malpractice in the original complaint but had been dropped in the amended complaint. Explaining why the amended complaint did not represent an attempt to avoid demurrer by omitting essential facts or pleading inconsistent facts, the court stated: "Here . . . the [plaintiffs] have not omitted facts without explanation or pleaded inconsistent facts to avoid the statute of limitations. Instead, they have dropped their time-barred claims for negligence related to the 1984 orders setting aside the initial property division and increasing [the husband's] support obligations, and to defense of the collateral lawsuit. They reasserted only the claims that [defendant] negligently advised them about the prior appeal's effect, and that the negligent advice caused [the second wife's] embroilment in the property division dispute and the finding that [the husband] violated fiduciary duties. The allegations in the amended complaint are consistent with those in the original complaint. Where the original complaint essentially alleged three instances of negligent conduct, and three types of resulting damage, the amended complaint alleges only the negligent advice and the damages related to that advice. Consequently, we do not concern ourselves with the superseded negligence claims." (*Baltins, supra,* 36 Cal.App.4th at pp. 1205–1206.)

Here, as in *Baltins,* there were two separate and distinct acts of negligence with separate and distinct potential injuries and statutes of limitations. Injury from prepayment of principal could arise at any time during the note's 20-year term; injury from the failure to address the deferred interest would not necessarily manifest itself until it became due at the note's end. We perceive no reason why Fritz could not simply have omitted all discussion of the prepayment prohibition and gone forward with the complaint based on

impairment of the deferred interest only. The fact that the former may have been barred by the statute of limitations does not mean the latter must be similarly barred.

## II

Our conclusion that the statute of limitations did not accrue in 1995 or 2000 for purposes of the deferred interest portion of Fritz's claim does not end our inquiry. The facts put forth in Ehrmann's papers established that the Patels refused to pay the deferred interest and that Fritz became aware that their refusal was due to ambiguity in the second note sometime between January 2002, when the Patels claimed to have made their "LAST & FINAL PAYMENT," and June 2002, when they filed the quiet title lawsuit. The malpractice action was not filed until November 2003. Ehrmann alleged that even if the statute accrued in mid-2002, filing the lawsuit in November 2003 put it past any conceivable extension of section 340.6's one-year statute of limitations. Fritz contends the statute was tolled by section 340.6, subdivision (a)(2), which precludes the statute from running as long as "[t]he attorney continues to represent the plaintiff regarding the specific subject matter in which the alleged wrongful act or omission occurred."

The record is clear that Ehrmann represented Fritz with respect to the second note until it was executed in or around September 1995. Then there was a lengthy hiatus when no attorney action was required with respect to the note, although Ehrmann continued to represent Fritz with respect to other matters. In January 2002, the Patels claimed to have paid the note in full and began to demand reconveyance of the deed of trust. At some point prior to April 18, 2002, Ehrmann became involved in attempting to negotiate with the Patels to resolve the dispute.[8]

As we have seen, section 340.6, subdivision (a)(2), states that the limitations period shall be tolled during the time the attorney "continues to represent" the plaintiff regarding the specific subject matter in which the alleged wrongful act or omission occurred. The resolution of this dispute turns on the interpretation of the phrase "continues to represent."

Fritz cites *Lockley v. Law Office of Cantrell, Green, Pekich, Cruz & McCort* (2001) 91 Cal.App.4th 875 [110 Cal.Rptr.2d 877] (*Lockley*), *Worthington v. Rusconi* (1994) 29 Cal.App.4th 1488 [35 Cal.Rptr.2d 169] (*Worthington*), and *Crouse, supra,* 67 Cal.App.4th 1509, for the proposition that representation

---

[8] The summary judgment papers did not attempt to establish precisely when Ehrmann became involved in the dispute with the Patels. We know from the letter dated April 18, 2002, in which he agreed to represent Fritz without fee, that it was sometime prior to that date.

may be deemed continuous where a hiatus separates completion of a transaction on behalf of a client and resumption of legal activities after a problem arises, many years later. None of these cases addressed that issue.

In *Lockley, supra,* 91 Cal.App.4th 875, the plaintiff was a police officer terminated from his employment in 1988. He filed a workers' compensation claim and a claim alleging racial discrimination. The Cantrell firm represented him in connection with the workers' compensation claim. The plaintiff entered into a settlement agreement with his former employer in which he agreed to relinquish all his claims in exchange for assistance in obtaining disability retirement. The employer subsequently breached the agreement, and the plaintiff revived his workers' compensation claim. The workers' compensation judge (WCJ) awarded him damages and reinstated him to his position as a police officer. His attorneys raised the settlement agreement before the WCJ, but the WCJ refused to approve it. Ultimately, the damages awarded by the WCJ were affirmed but the reinstatement was not, and the Court of Appeal questioned why no action had been pursued for breach of the settlement agreement. The plaintiff filed a malpractice action against the Cantrell firm for failure to enforce the settlement agreement and failure to advise him concerning his racial discrimination and wrongful termination claims. The trial court sustained a demurrer on statute of limitations grounds.

On appeal, the Cantrell firm argued that assuming it had represented the plaintiff in connection with the settlement agreement, any such representation would have been separate and distinct from the workers' compensation claim, and the time to pursue a malpractice action related to the settlement agreement had passed. The Court of Appeal concluded that because the settlement agreement "clearly and adversely affected [the plaintiff's] claim to all workers' compensation benefits," the firm's "advice to [the plaintiff] in connection with the agreement and [the firm's] representation with regard to [the plaintiff's] workers' compensation claim appear, at least at this stage of the litigation, to have comprised the same specific subject matter." (*Lockley, supra,* 91 Cal.App.4th at p. 889.) Because litigation with regard to the workers' compensation claim was continuous, the court had no need to address the issue of whether an interruption would have had an impact on the tolling provision in section 340.6, subdivision (a)(2), so its opinion is not dispositive here.

In *Worthington, supra,* 29 Cal.App.4th 1488, the plaintiff's mother left her a life estate in certain property. The defendant, an attorney she consulted in 1988, advised her to renounce the life estate. In 1991, when problems arose, she contacted the attorney and he offered further advice by letter dated April 5, 1991. On May 1, 1991, the plaintiff formally substituted a new attorney for the defendant. Eleven months later, she filed a malpractice action against her

former attorney for allegedly putting his financial interests ahead of hers in 1988 in advising her to renounce the life estate in order to increase his fee. The court concluded that the representation did not terminate until April or May 1991, applying the following objective standard: "Continuity of representation ultimately depends, not on the client's subjective beliefs, but rather on evidence of an ongoing *mutual* relationship and of activities in furtherance of the relationship." (29 Cal.App.4th at p. 1498.) As in *Lockley*, the court did not specifically address the issue of interrupted representation, since the only issue raised by the defendant was whether the representation ceased when the plaintiff first consulted another lawyer in March 1991.

The plaintiff in *Crouse, supra*, 67 Cal.App.4th 1509, had hired the Brobeck firm to advise her in connection with the sale of a limited partnership interest in 1987. The attorney who assisted her was named Boatwright. The sale closed at the end of 1988. The plaintiff was supposed to receive a promissory note from the purchasers, but Boatwright failed to ensure that the note was delivered to her or held in a secure location. In 1989, Boatwright left the Brobeck firm and joined the Page firm. In 1990, the parties wished to enter into a new agreement involving a new note. The plaintiff retained Boatwright and the Page firm to represent her. Because Boatwright was unable to produce the original note, the deal fell through. Later, however, a new agreement was reached which did not require surrender of the note. From 1990 until July 1993, Boatwright continued to represent the plaintiff by collecting the proceeds from the restructured note and negotiating a discounted payoff of the note. The plaintiff obtained independent legal advice in October 1990, and filed her malpractice complaint which, due to a tolling agreement, was deemed to have an effective date of December 1993.

The court addressed the issue of whether a malpractice claim based on Boatwright's alleged negligence in connection with the loss of the note in 1988 was time-barred. The trial court had apparently granted a partial summary judgment in his favor with respect to any 1988 negligence on statute of limitations grounds. But the summary judgment was based on the first and second notes being two different matters, not any hiatus in the representation. The Court of Appeal analyzed the issue, and concluded that Boatwright's later representation of the plaintiff involved the same, specific subject matter. Therefore, the statute of limitations was tolled. (*Crouse, supra*, 67 Cal.App.4th at p. 1538.)

■ Notwithstanding the lack of relevant case authority, we believe Fritz's position is the correct one. "In construing a statute, our principal task is to ascertain the intent of the Legislature." (*People v. Broussard* (1993) 5 Cal.4th 1067, 1071 [22 Cal.Rptr.2d 278, 856 P.2d 1134].) "We do so by first turning to the words themselves, giving them their ordinary meaning." (*Ibid.*) "When

statutory language is clear and unambiguous, there is no need for construction and courts should not indulge in it." (*People v. Overstreet* (1986) 42 Cal.3d 891, 895 [231 Cal.Rptr. 213, 726 P.2d 1288].) "When the language is susceptible of more than one reasonable interpretation, however, we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." (*People v. Woodhead* (1987) 43 Cal.3d 1002, 1008 [239 Cal.Rptr. 656, 741 P.2d 154].) Moreover, " ' "language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend." ' " (*Younger v. Superior Court* (1978) 21 Cal.3d 102, 113 [145 Cal.Rptr. 674, 577 P.2d 1014].) In such circumstances, "[t]he intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act." (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].)

The Legislature's intent in adopting the continuing-representation tolling provision contained in section 340.6, subdivision (a)(2), is set forth in the legislative history. There were two purposes: (1) "to 'avoid the disruption of an attorney-client relationship by a lawsuit while enabling the attorney to correct or minimize an apparent error,' " and (2) " 'to prevent an attorney from defeating a malpractice cause of action by continuing to represent the client until the statutory period has expired.' " (*Laird v. Blacker* (1992) 2 Cal.4th 606, 618 [7 Cal.Rptr.2d 550, 828 P.2d 691], quoting Sen. Com. on Judiciary, 2d reading analysis of Assem. Bill No. 298 (1977–1978 Reg. Sess.) as amended May 17, 1977; accord, *Crouse, supra,* 67 Cal.App.4th at p. 1535.)

The interpretation of section 340.6 put forth by Ehrmann would undermine the legislative intent behind the tolling provision for the majority of situations where an attorney commits malpractice during the preparation of transactional documents. In most instances, mistakes in transactional documents do not manifest themselves until after the project is completed. The first impulse of a client who learns about a problem in a transactional document prepared by his or her attorney is to return to that attorney for an explanation or a fix. An honest attorney will admit to mistakes made and work in good faith to correct or mitigate any damage, as Ehrmann did here. The client is unlikely to consult another source for legal advice while the first attorney is working to rectify the issue—a process that could take years. This means it would be up to the attorney who made the mistake to inform the client that time is ticking on a legal malpractice action. While we have no doubt that most attorneys would do just that, the interpretation urged by Ehrmann would afford unscrupulous lawyers an opportunity to simply let the statute run. It would be incongruous to construe the legal malpractice scheme in a way that would compel only honest attorneys to face the consequences of their negligent actions.

■ We hold instead that by "continues to represent" the Legislature meant that the statute of limitations for legal malpractice is tolled as long as the attorney "continues to represent" a client who comes to him or her after the potential malpractice manifests itself and before the statute of limitations has run in an attempt to rectify the problem or mitigate damages. In this case, that means the statute was tolled during the period Ehrmann represented Fritz with respect to the dispute with the Patels. Since, under the facts presented, there was at most a three-month period (from Jan. to Apr.) after the Patels raised the issue concerning deferred interest to the time Ehrmann agreed to represent Fritz in resolving the dispute, and a seven-month period from the time new attorneys substituted for Ehrmann and the date the malpractice complaint was filed, Ehrmann did not establish for purposes of summary judgment that the statute of limitations had run.

## DISPOSITION

The judgment is reversed. The matter is remanded to the trial court for further proceedings consistent with this opinion. Appellant is awarded costs on appeal.

Epstein, P. J., and Hastings, J.,* concurred.

---

*Retired Associate Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.