[No. B221338. Second Dist., Div. Seven. Apr. 19, 2011.]

SUSAN V.I. CALLAHAN, as Trustee, etc., et al., Plaintiffs and Appellants,
v.
GIBSON, DUNN & CRUTCHER LLP, Defendant and Respondent.

558

COUNSEL

Kiesel Boucher Larson, Raymond P. Boucher, Michael C. Eyerly; Alder Law, Michael C. Alder; Esner, Chang & Boyer, Esner & Chang and Stuart B. Esner for Plaintiffs and Appellants.

Gibson, Dunn & Crutcher, Joseph P. Busch III, Daniel M. Kolkey and Maura M. Logan for Defendant and Respondent.

OPINION

**PERLUSS, P. J.**—Inge Realty Company, a California limited partnership, Susan V.I. Callahan, as trustee of the Robert E. Inge Children's Trusts (Trust No. 1), Sophia Inge, as trustee of the Robert Inge Family Trust, Sophia Inge and Susan V.I. Callahan, as co-executors of the Estate of Robert E. Inge, and Sophia Inge, individually (collectively, Robert Inge family members) appeal from the judgment entered after the trial court granted summary judgment in favor of Gibson, Dunn & Crutcher LLP (Gibson, Dunn) in this legal malpractice action arising out of Gibson, Dunn's drafting of Inge Realty Company's limited partnership agreement dated October 20, 1988. The Robert Inge family members contend the trial court erred in concluding, as a matter of law, they had sustained "actual injury" at the time of execution of the partnership agreement and their legal malpractice action was thus time-barred. We reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The Creation of the Limited Partnership*

Inge Realty Company was founded in 1955 by brothers Robert and Oliver Inge. It engaged in the business of buying and selling properties and renting properties it owned to tenants.

In September 1988 Robert and Oliver[1] retained Gibson, Dunn to advise them regarding the best way to restructure their successful business (then operating as a real estate trust) to minimize income tax liabilities and to implement the succession plan that Robert and Oliver desired. According to the Robert Inge family members, during the initial meeting and thereafter, Robert and Oliver explained they wanted Inge Realty Company to continue as a family-run enterprise after they could no longer run the business.

Gibson, Dunn recommended the brothers' business be converted to a limited partnership with Robert and Oliver serving as general partners. On September 22, 1988 Gibson, Dunn partner Gordon Schaller sent a draft limited partnership agreement to Robert and Oliver with a cover letter stating, "The basic function of this Agreement is to allow you to continue the operations of Inge Realty Company in a structure with less tax risks than a trust and more flexibility for purposes of gifting interests and operation in the event of your deaths."

A final form of the partnership agreement, dated October 20, 1988, was executed in October 1988. Robert and Oliver were each named general partners; each held a 2 percent interest in the partnership; and each had an equal right to run the business. The Oliver V. Inge Trust and the Robert E. Inge Trust were each given a 48 percent limited partnership interest in the business.

Paragraph 1.6 of the partnership agreement provided, "The term of this Partnership shall commence on the Effective Date of this Agreement, and, unless extended by agreement of all of the Partners or terminated earlier pursuant to this Agreement, shall continue until December 31, 2038."

Paragraph 9.5 of the partnership agreement provided, in part, "Anything in this Agreement to the contrary notwithstanding, the General Partners shall have no authority, without the unanimous vote of the Limited Partners, to: [¶] . . . [¶] (f) After the death, retirement or insanity of a General Partner, to continue the business of the Partnership with Partnership property, except as is provided in this Agreement."

Paragraph 13.1 of the partnership agreement provided, in part, "The Partnership shall be dissolved upon the happening of any of the following events: [¶] (a) The death, disability, insanity, incompetency, dissolution, bankruptcy, retirement, resignation or expulsion of all of the General Partners."

---

[1] Because Robert, Oliver and other family members share the same last name, we refer to them by their first names, as do their counsel, for convenience and clarity. (See *Cruz v. Superior Court* (2004) 120 Cal.App.4th 175, 188, fn. 13 [14 Cal.Rptr.3d 917].)

Paragraph 13.3 of the partnership agreement provided, in part, "Notwithstanding anything to the contrary provided in this Agreement, upon the death of any of the General Partners, the following provisions shall control: [¶] (a) If either Oliver V. Inge ('Oliver') or Robert E. Inge ('Robert') predeceases the other (such predeceasing Partner being referred to as the 'deceased brother'), the deceased brother's interest as a General Partner shall be converted to an interest as a Limited Partner . . . . [¶] (b) Upon the death of the survivor of Robert and Oliver, each of the Limited Partners hereby agrees that, if so requested by either of Robert's or Oliver's respective surviving wives, they shall vote to continue the Partnership on the same terms and conditions as are contained in this Agreement and elect such requesting wife or wives as the sole successor General Partner(s) of the Partnership. Either such surviving wife may make such a request by delivering to each of the Partners a written notice stating the same within thirty (30) days after the death of the survivor of Robert and Oliver."

### 2. *Oliver's Death, the Probate Action and the Issue of Involuntary Dissolution*

Oliver died on February 22, 2003, and Robert became the sole general partner of Inge Realty Company. According to Oliver's estate plan, his assets were held in the Oliver V. Inge Trust upon his death. Bank of the West, which had been substituted for Robert as successor trustee of the Oliver V. Inge Trust shortly before Oliver's death, also became executor of Oliver's estate.

The primary asset in the Oliver V. Inge Trust was its now 50 percent limited partnership interest in the Inge Realty Company, which was valued at approximately $10.5 million. The trust and the estate, however, did not have sufficient liquid assets to pay the then owed $5.4 million in estate taxes and other related expenses and bequests made by Oliver, which exceeded $4 million. The Robert Inge family members were advised that if Oliver's trust were unable to timely pay the taxes due, the Internal Revenue Service might impose a "forced dissolution of the partnership."

Following Oliver's death, Bank of the West made demands for partnership income distributions from Inge Realty Company on behalf of Oliver's trust. The demands were refused, apparently on the ground that Oliver had impermissibly amended his trust beginning in late 2001 by adding non-Inge family members as beneficiaries and that distributions from Inge Realty Company to non-Inge family members were not authorized. Then, in April 2004 Bank of the West initiated a probate action (a petition for instructions) that ultimately sought, among other things, dissolution of the partnership in part pursuant to Corporations Code former section 15682, subdivision (b), because Robert had allegedly engaged in "pervasive fraud and abuse of

authority" by not authorizing distributions to Bank of the West as trustee of Oliver's trust[2] and in part on the ground the partnership had dissolved under the terms of paragraph 13.1 of the partnership agreement because Robert was now "disabled and/or incompetent to act in the business of Inge Realty," leaving no general partner to run the business.[3] According to the Robert Inge family members, at the time Sophia, Robert's wife, was prepared to run the company.

The Robert Inge family members were named as respondents in the Bank of the West probate action. They assert they were advised by their lawyers that drafting problems with the partnership agreement presented a real risk that Bank of the West would succeed in effecting a dissolution of the partnership and that settlement of the probate action was therefore advisable. Robert died in October 2004, but the probate action continued; Bank of the West did not concede the propriety of Sophia's assumption of the role of general partner. The parties to the probate action eventually settled their various disputes in mid-November 2005. The court approved the settlement on December 29, 2006.

### 3. *The Robert Inge Family Members' Legal Malpractice Action*

In December 2004 the Robert Inge family members entered into tolling agreements with Gibson, Dunn regarding claims that might be asserted regarding the law firm's legal representation of Inge Realty Company and its partners, and in particular, with respect to advice concerning, and the drafting of, the October 20, 1988 limited partnership agreement. Those tolling agreements were renewed or extended through June 20, 2007.

The Robert Inge family members filed a complaint on June 19, 2007, a first amended complaint on December 27, 2007 and a second amended complaint on May 2, 2008, asserting claims against Gibson, Dunn for professional negligence, breach of fiduciary duty and negligent infliction of emotional distress. The second amended complaint alleges, in part, Robert and Oliver's primary goal in retaining Gibson, Dunn in 1988 was to preserve and protect Inge Realty Company as a family business and to ensure it remained at all times in the Inge family. Yet, under the terms of the partnership agreement as

---

[2] The initial petition also sought dissolution of the partnership on grounds of "general equity" under Corporations Code former section 15682, subdivision (c).

[3] The contentions Robert was not authorized to continue operating the business as the remaining general partner and Bank of the West was entitled as a limited partner to demand dissolution under the terms of the partnership agreement were first raised in an April 30, 2004 letter from Bank of the West to Inge Realty Company. The contention Robert had become "disabled" due to colon cancer was presented to the probate court in October 2004 and deemed by the court to constitute a supplement to Bank of the West's petition.

drafted by Gibson, Dunn, there was no provision for the limited partnership to continue except upon the death of both general partners. "In particular, there was no mechanism in the agreement for the continuation of the [partnership] if the sole remaining partner was incompetent or disabled or retired." According to the second amended complaint, the Robert Inge family members reasonably believed there was a likelihood Robert could be found to be incompetent and/or disabled and/or retired after Bank of the West asserted in mid-2004 he was largely incapacitated by a stroke and no longer active in the operation of the business and, as a result of Gibson, Dunn's negligent drafting of the provisions of the partnership agreement relating to succession and termination, the partnership would terminate by operation of law. The Robert Inge family members further allege, because of these drafting deficiencies and risk of partnership dissolution, Inge Realty Company was not in a position to assert necessary claims against Bank of the West in the probate action or to vigorously defend the claims made by the bank.

The second amended complaint alleges the Robert Inge family members were damaged by the negligent drafting of the partnership agreement in three essential respects: (1) Legal fees were paid to Gibson, Dunn for the preparation of a partnership agreement that did not accomplish the express goal of the representation because it did not provide a mechanism for the continuation of the partnership except upon the death of both general partners or upon the unanimous consent of all limited partners. (2) The Robert Inge family members were forced to defend and settle a meritless lawsuit—a settlement that required liquidation of assets and/or obtaining of financing to purchase the limited partnership interest held by Oliver's trust, as well as lifetime payments to nonqualifying recipients who claimed to be beneficiaries of Oliver's trust. (3) Legal fees were paid to lawyers other than Gibson, Dunn to defend against claims made by Bank of the West in the probate action, including claims directly related to the issue of succession and termination of the partnership.

### 4. Gibson, Dunn's Motion for Summary Judgment; the Trial Court's Ruling

Gibson, Dunn answered the unverified second amended complaint in August 2008. The answer expressly asserted as a separate and additional defense that each cause of action in the complaint was barred by the limitations period set forth in Code of Civil Procedure section 340.6, subdivision (a) (section 340.6(a)).

On July 31, 2009 Gibson, Dunn moved for summary judgment. The motion asserted the Robert Inge family members' claims were time-barred pursuant to section 340.6(a); Gibson, Dunn did not breach any duty of care to

its clients when it drafted the partnership agreement; and Gibson, Dunn's alleged negligent conduct did not cause the Robert Inge family members to suffer any damages. With respect to the application of section 340.6(a) to the claims, Gibson, Dunn noted that, absent tolling, the limitations period for a claim of legal practice expired no later than October 1992 (four years after the partnership agreement was drafted and executed). No tolling occurred under section 340.6(a), Gibson, Dunn then argued, because the Robert Inge family members suffered an "actual injury" upon execution of the partnership agreement—that is, when Robert and Oliver entered into a contract that set forth their legal rights and altered their legal relationship to each other. Moreover, Gibson, Dunn continued, both Robert and Oliver suffered an additional actual injury in October 1988 in the form of attorney fees paid to Gibson, Dunn, which the Robert Inge family members seek to recover in their lawsuit on the theory the amount paid exceeded the value of the services provided.

In its moving papers Gibson, Dunn also pointed to undisputed facts that demonstrated the firm did not continue to represent Robert or the Robert Inge family members regarding the subject matter of the malpractice claim after October 1988, thus precluding tolling under a continuous representation theory. With respect to its argument concerning the absence of loss causation, Gibson, Dunn contended undisputed facts established that the settlement of the probate action was unaffected by the purported flaws regarding succession in the partnership agreement.

In their opposition papers the Robert Inge family members argued, in part, no actual injury occurred as a result of Gibson, Dunn's negligent drafting of the partnership agreement until, at the earliest, April 2004, when the succession problems first came to light as a result of Bank of the West's claim Robert was disabled and/or incompetent and the partnership, therefore, was dissolved under the terms of the agreement. Because of the tolling agreements thereafter entered by Gibson, Dunn and the Robert Inge family members, the lawsuit, filed on June 19, 2007, was timely. The opposition papers also asserted material issues of fact existed with respect to breach and loss causation.

After further briefing and oral argument, on October 5, 2009 the trial court granted Gibson, Dunn's motion on the ground the action is barred by the statute of limitations. As set forth in its tentative ruling, which was provided to the parties and which the court then adopted as its order, "Defendant met its initial burden of showing that the statute of limitations ran no later than 1992, and Plaintiffs have failed to raise a triable issue of material fact re: tolling due to lack of actual injury." The court also stated, "Defendant provides evidence in moving papers that it did not 'continue to represent'

Plaintiffs from 1988 through the probate litigation. Plaintiffs fail to address this argument in opposition. Plaintiffs therefore fail to meet their burden showing that the doctrine of continued representation tolls the statute of limitations." Because its ruling on the limitations issue was dispositive, the court declined to rule on the other grounds asserted in support of the motion for summary judgment.

## CONTENTIONS

The Robert Inge family members contend neither execution of the partnership agreement nor payment of fees to Gibson, Dunn to prepare the partnership agreement constitutes actual injury under section 340.6(a) sufficient to trigger the limitations period. Gibson, Dunn contends, even if summary judgment was not properly granted on the ground the action is time-barred, the judgment should be affirmed because the Robert Inge family members cannot prove loss causation.

## DISCUSSION

### 1. *Standard of Review*

A motion for summary judgment is properly granted only when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) We review a grant of summary judgment de novo and decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law. (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348 [1 Cal.Rptr.3d 32, 71 P.3d 296].) We view the evidence in the light most favorable to the opposing party, liberally construing the opposing party's evidence and strictly scrutinizing the moving party's. (*O'Riordan v. Federal Kemper Life Assurance Co.* (2005) 36 Cal.4th 281, 284 [30 Cal.Rptr.3d 507, 114 P.3d 753].)

### 2. *The Trial Court Erred in Granting Summary Judgment Based on Its Finding the Robert Inge Family Members Had Sustained Actual Injury in 1988 upon Execution of the Partnership Agreement or Payment of Legal Fees to Gibson, Dunn for Preparation of the Allegedly Defective Agreement*

#### a. *The limitations period for legal malpractice claims;* Jordache *and the meaning of "actual injury"*

■ A cause of action for legal malpractice must be filed "within one year after the plaintiff discovers, or through the use of reasonable diligence should

have discovered, the facts constituting the wrongful act or omission, or four years from the date of the wrongful act or omission, whichever occurs first." (§ 340.6(a).)[4] However, section 340.6(a) further provides, "[I]n no event shall the time for commencement of legal action exceed four years except that the period shall be tolled during the time that any of the following exist: [¶] (1) The plaintiff has not sustained actual injury. . . ."

Gibson, Dunn's alleged malpractice occurred in September and October 1988 when it prepared the Inge Realty Company's limited partnership agreement containing the allegedly defective succession and termination provisions and, more particularly, omitted any method for replacement of the general partners if they became incompetent or retired. Gibson, Dunn asserts, and the Robert Inge family members do not dispute, that the absence of a comprehensive succession plan—and the consequent threat of immediate dissolution in the event the surviving general partner became disabled and ceased being active in the business—could have been discovered through the use of reasonable diligence at the time the partnership agreement was finalized and executed. Accordingly, the Robert Inge family members' legal malpractice action was untimely if they suffered actual injury within the meaning of section 340.6(a) more than one year prior to December 2004 when they entered into formal tolling agreements with Gibson, Dunn regarding the claims asserted in this lawsuit.[5]

 Our analysis of this question, as both the Robert Inge family members and Gibson, Dunn recognize, focuses on *Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739 [76 Cal.Rptr.2d 749, 958 P.2d 1062] (*Jordache*), the leading (and most recent) case in which the Supreme Court addressed the meaning of the term "actual injury" in section

---

[4] In *Samuels v. Mix* (1999) 22 Cal.4th 1 [91 Cal.Rptr.2d 273, 989 P.2d 701] the Supreme Court confirmed the one-year-from-discovery provision in section 340.6(a), like the statute's four-years-from-wrongful-act provision, is an affirmative defense to a cause of action for attorney malpractice. (*Samuels*, at p. 7.) "Just as plainly as section 340.6(a) makes the plaintiff's actual or constructive discovery of the defendant's wrongdoing an element of its one-year-from-discovery limitations defense, it does *not*—nor does any other law—make the plaintiff's actual or constructive discovery of the defendant's wrongdoing an element of a prima facie claim for attorney malpractice." (*Id.* at p. 8.)

[5] The same limitations period governs the Robert Inge family members' claim for breach of fiduciary duty (see *Stoll v. Superior Court* (1992) 9 Cal.App.4th 1362, 1363 [12 Cal.Rptr.2d 354] ["statute of limitations within which a client must commence an action against an attorney on a claim for legal malpractice or breach of a fiduciary duty is identical"]), as well as their claim for negligent infliction of emotional distress (see *Levin v. Graham & James* (1995) 37 Cal.App.4th 798, 805 [44 Cal.Rptr.2d 69] ["[i]n all cases other than actual fraud, whether the theory of liability is based on the breach of an oral or written contract, a tort, or a breach of fiduciary duty, the one-year statutory period [from the date the client discovers or through the use of reasonable diligence should have discovered the facts constituting the wrongful act or omission] applies"]; *Quintilliani v. Mannerino* (1998) 62 Cal.App.4th 54, 68 [72 Cal.Rptr.2d 359] [same]).

340.6(a). The *Jordache* court held, in brief, "Actual injury occurs when the client suffers any loss or injury legally cognizable as damages in a legal malpractice action based on the asserted errors or omissions. . . . [S]ection 340.6, subdivision (a)(1), will not toll the limitations period once the client can plead damages that could establish a cause of action for legal malpractice." (*Jordache*, at p. 743, citations omitted.)

In *Jordache* the defendant law firm had allegedly failed to advise its clients they had insurance coverage for the defense of a significant, long-running lawsuit. After replacing the original law firm for other reasons, the clients sued their liability insurers for $30 million in attorney fees and costs paid to defend the original litigation. That coverage action was ultimately settled for $12.5 million, a compromise based at least in part on the potential success of the carriers' "late notice" defense to their contractual obligation to pay fees and costs for the underlying suit. (*Jordache, supra*, 18 Cal.4th at pp. 744–746.)

The clients then sued their original law firm for negligence, seeking to recover the additional $17.5 million in defense costs they felt should have been covered by insurance. The law firm argued the malpractice claim was time-barred, contending their former clients had sustained actual injury when they were required to pay defense costs in the underlying litigation, diverting investment funds that otherwise could have been used to earn profits, or when they lost the benefit of the insurance policies for which they had paid during the period before they tendered the defense of the underlying action to the insurance carriers. The clients responded they had not suffered actual injury until forced to settle for less than the full defense costs. The trial court granted summary judgment; the Court of Appeal reversed, concluding "whether [the law firm's] omissions impaired [the clients'] interests in the benefits of its insurance policies was contingent on the outcome of the [insurance coverage] action." (*Jordache, supra*, 18 Cal.4th at pp. 744–747.) The Supreme Court reversed the appellate court in a comprehensive opinion, holding the clients had sustained actual injury within the meaning of section 340.6(a) before the settlement of the insurance coverage litigation. (*Jordache*, at p. 743.)

The court began by summarizing its earlier holdings in *Adams v. Paul* (1995) 11 Cal.4th 583 [46 Cal.Rptr.2d 594, 904 P.2d 1205]: "(1) determining actual injury is predominantly a factual inquiry; (2) actual injury may occur without any prior adjudication, judgment, or settlement; (3) nominal damages, speculative harm, and the mere threat of future harm are not actual injury; and (4) the relevant consideration is the fact of damage, not the amount." (*Jordache, supra*, 18 Cal.4th at p. 743.) It then reiterated that the actual injury tolling provision in section 340.6(a) derived from the court's

decision in *Budd v. Nixen* (1971) 6 Cal.3d 195 [98 Cal.Rptr. 849, 491 P.2d 433]:[6] "*Budd* recognized that 'actual loss or damage resulting from the professional's negligence' was an essential element of a cause of action in tort for professional negligence. [Citation.] Thus, *Budd* held that the statute of limitations began to run when the plaintiff sustained loss or damage from the attorney's negligence that allowed the plaintiff to assert a malpractice cause of action. [Citation.] In section 340.6's terms, the one-year limitations period that commences when the plaintiff actually or constructively discovers the attorney's wrongful act or omission is no longer tolled after the plaintiff sustains actual injury, i.e., when the plaintiff can plead a legal malpractice cause of action. [¶] *Budd* remains instructive on the test for actual injury: 'If the allegedly negligent conduct does not cause damage, it generates no cause of action in tort. [Citation.] The mere breach of a professional duty, causing only nominal damages, speculative harm, or the threat of future harm—not yet realized—does not suffice to create a cause of action for negligence. [Citations.] Hence, until the client suffers appreciable harm as a consequence of [the] attorney's negligence, the client cannot establish a cause of action for malpractice.' " (*Jordache*, at pp. 749–750.)

■ While instructing that "[a]n existing injury is not contingent or speculative simply because future events may affect its permanency or the amount of monetary damages eventually incurred" (*Jordache, supra*, 18 Cal.4th at p. 754), the *Jordache* court also emphasized the need to distinguish between "an actual, existing injury that might be *remedied or reduced* in the future, and a speculative or contingent injury that might or might not arise in the future" (*ibid.*, italics omitted; see *Adams v. Paul, supra*, 11 Cal.4th at p. 589 ["[T]he *fact* of damage rather than the *amount* is the relevant consideration. [Citation.] In addition, the character or quality of the injury must be manifest and palpable."]). The court further cautioned, "[T]here are no short cut 'bright line' rules for determining actual injury under section 340.6. [Citations.] Instead, actual injury issues require examination of the particular facts of each case in light of the alleged wrongful act or omission." (*Jordache*, at p. 761, fn. 9.)

Applying these principles to the undisputed facts before it, the court held the clients had sustained actual injury by the time they had discovered (with the assistance of new counsel) their original law firm's negligence in not notifying their insurers of the underlying litigation: "By then, Jordache had lost millions of dollars—both in unpaid insurance benefits for defense costs

---

[6] Budd had sued Nixen for legal malpractice. Nixen, *claiming the cause of action accrued on the date of his negligent conduct, argued the action was time-barred. The Supreme Court held the limitations period for a cause of action for legal malpractice does not begin to run until the plaintiff suffers appreciable harm as a result of his or her attorney's negligence. (Budd v. Nixen, supra, 6 Cal.3d at pp. 200–201.)*

in the Marciano action and in lost profits from diversion of investment funds to pay these defense costs. As Brobeck asserts, these damages were sufficiently manifest, nonspeculative, and mature that Jordache tried to recover them as damages in its insurance coverage suits." (*Jordache, supra,* 18 Cal.4th at p. 752.)

 b. *Gibson, Dunn's Allegedly Negligent Drafting of the Partnership Agreement Caused Only Speculative or Contingent Harm (or a Threat of Future Harm) Before Robert Became Disabled*

 Citing *Hensley v. Caietti* (1993) 13 Cal.App.4th 1165 [16 Cal.Rptr.2d 837], *Radovich v. Locke-Paddon* (1995) 35 Cal.App.4th 946 [41 Cal.Rptr.2d 573] and several other pre-*Jordache* cases holding actual injury occurred when an agreement dividing marital property or other form of settlement agreement was signed because the parties' legal relations were altered at that point, Gibson, Dunn argues the Robert Inge family members suffered actual injury as a result of its allegedly negligent drafting of the succession and termination provisions of the partnership agreement when the agreement was signed by Robert and Oliver and became the governing document of their real estate business. Although acknowledging the partnership agreement became effective in October 1988, the Robert Inge family members contend they suffered no actual injury until April 30, 2004 when Bank of the West first made its claim that, due to Robert's disability and supposed incompetence, the partnership could be dissolved. Simply put, the question is whether in October 1988 the allegedly defective succession provisions in the partnership agreement caused an actual, existing injury that might be remedied or reduced in the future (for example, by amending the partnership agreement while both general partners were still alive) or a speculative or contingent injury that might or might not arise in the future. (See *Jordache, supra,* 18 Cal.4th at p. 754 ["speculative and contingent injuries are those that do not yet exist, as when an attorney's error creates only a potential for harm in the future"].)

 ■ Without question, a party's alteration of its legal position in reliance on its counsel can constitute actual injury even though the party may be able to avoid or reduce the injury through subsequent legal action. For example, in *Hensley v. Caietti, supra,* 13 Cal.App.4th 1165 the plaintiff, Joyce Hensley, alleged her former attorney had committed malpractice by inducing her to enter into an unfavorable marital settlement agreement, which the trial court approved and stated on the record was effective immediately. (*Id.* at p. 1168.) The judgment incorporating the stipulated agreement, however, was not entered until sometime later. In the interim, Hensley and her former counsel argued about the proposed judgment, with Hensley insisting she had been unaware of the terms of the stipulation presented to the court. (*Ibid.*)

The Court of Appeal affirmed the trial court's order granting summary judgment on the ground the action was time-barred, rejecting Hensley's contention she had not sustained actual injury until the effective date of the judgment: "Negligent legal advice which induces a client to enter into a binding contract resolving marital property and support issues results in actual injury at the point of entry. Entering a contract is a jural act which alters the legal relations of the parties and creates an obligation." (*Hensley v. Caietti, supra,* 13 Cal.App.4th at p. 1175.)[7]

Similarly in *Radovich v. Locke-Paddon, supra,* 35 Cal.App.4th 946, a husband claimed his attorneys had negligently caused him to sign documents waiving his community property rights in various assets, but asserted their wrongful conduct did not cause him injury until his wife's death in 1991, many years later, when the community property was divided. Adopting the analysis of *Hensley v. Caietti, supra,* 13 Cal.App.4th 1165 and *Turley v. Wooldridge* (1991) 230 Cal.App.3d 586 [281 Cal.Rptr. 441],[8] the Court of Appeal explained that, but for those waivers, during his marriage Radovich would have had a " 'present, existing and equal' " interest in the affected community property, and that property would have been subject in varying measure to his control and disposition and to application to his debts. (*Radovich,* at p. 975.) "Each of these considerations would have been of real and immediate benefit to Radovich '[t]hroughout the thirty-four years of the marriage,' and it follows that the agreement by which he ostensibly relinquished any community-property right in the decedent's acquisitions . . . caused him immediate and actual injury throughout the same thirty-four years." (*Ibid.*) The *Radovich* court further held the fact that the husband had

---

[7] Analyzing the applicability of section 340.6(a)(2), which provides for tolling while "[t]he attorney continues to represent the plaintiff regarding the specific subject matter in which the alleged wrongful act or omission occurred," the court also held the limitations period ran from the date Hensley acted upon her decision to discharge her former attorney by engaging new counsel, not from the date the former counsel received notice of his discharge. (*Hensley v. Caietti, supra,* 13 Cal.App.4th at p. 1168.)

[8] In *Turley v. Wooldridge, supra,* 230 Cal.App.3d 586, the court held the plaintiff had suffered " 'actual injury' " from "the allegedly unequal community property division when she executed" the marriage termination agreement at issue, which became effective on the date of its execution. (*Id.* at p. 593.) The *Turley* court further stated: "The fact that she could have challenged the Agreement in an action for rescission or other contract relief, or the interlocutory judgment under section 473 or the court's equitable powers did not affect the date she suffered actual harm. When she signed the purportedly unfair Agreement on the alleged negligent advice of counsel and thereby rendered it effective, all essential elements of her cause of action for legal malpractice had occurred. There was no justification for tolling the statute of limitations beyond that point." (*Ibid.*; see also *Pompilio v. Kosmo, Cho & Brown* (1995) 39 Cal.App.4th 1324, 1328–1329 [46 Cal.Rptr.2d 409] [clients sustained actual injury when they agreed to settle a dispute during arbitration based on allegedly negligent legal advice, not three years later when the superior court entered judgment on the settlement set forth in the arbitration award; efforts to resist enforcement of the settlement agreement did not toll the limitations period].)

remedied some of his losses by filing litigation against third parties did not mean actual injury did not occur once he signed the documents: "[O]nce actual injury has been found, the fact the injury is not 'irremediable' is of no consequence to the section 340.6 issues." (*Id.* at pp. 978–979.)

Significantly, in each of these cases not only the agreement itself, but also the specific provisions that adversely impacted the former client of the allegedly negligent attorney, were effective immediately: Hensley lost certain rights to support and property when the stipulated marital settlement agreement was approved by the court; Radovich lost his community property interest in his wife's assets when he signed the prenuptial agreement. A somewhat different situation was presented in *Foxborough v. Van Atta* (1994) 26 Cal.App.4th 217 [31 Cal.Rptr.2d 525] (*Foxborough*)—a case relied upon by both the Robert Inge family members and Gibson, Dunn—which involved alleged attorney negligence in connection with a sophisticated real estate transaction in which the attorney failed to secure for his client an unrestricted right, without time constraints, to annex the subsequent development of a property to an existing apartment complex.

"Foxborough owned two adjoining parcels of land in San Jose. On one parcel was a 296-unit apartment complex (the Apartments); the smaller parcel was undeveloped. From November 1978 through January 1981, Foxborough retained Van Atta to perform legal services concerning the two parcels. Van Atta was to assist in converting the Apartments into condominiums, transferring the Apartments to Daon Corporation (Daon) in a property exchange, and securing the right to develop the smaller parcel with condominiums that Foxborough could automatically annex to the Apartments without the approval of Daon or the owners of condominiums in the Apartments. The automatic annexation right, without time constraints, was of particular importance to Foxborough." (*Foxborough, supra*, 26 Cal.App.4th at p. 222.) Van Atta failed to obtain the automatic annexation right because, notwithstanding language in the parties' agreement, "a regulation required that any automatic annexation of land to an existing condominium take place within three years" after approval of the preceding phase of the development. (*Ibid.*) Foxborough learned of this failure no later than February 1985. (*Id.* at p. 223.) Foxborough subsequently sued Daon for failing to inform it of the limitation on its annexation right, but the Daon litigation was unsuccessful. On March 2, 1990 Foxborough lost its case and was ordered to pay Daon's attorney fees and costs. (*Ibid.*)

Foxborough brought suit against Van Atta on June 29, 1990 alleging Van Atta had failed to advise Foxborough of the existence and effect of the regulation or to advise Foxborough how automatic annexation otherwise could have been accomplished. (*Foxborough, supra*, 26 Cal.App.4th at

pp. 223–224.) The trial court granted summary judgment based on the statute of limitations. (*Id.* at p. 224.) On appeal Foxborough contended its action was not time-barred because it did not suffer actual injury until it lost the Daon litigation. (*Id.* at p. 225.) The Court of Appeal rejected that argument, explaining, "Though Van Atta's alleged negligence may have contributed to the Daon litigation judgment, that judgment was but the last in time of the alleged injuries." (*Id.* at p. 226.) Instead, the court held Foxborough had sustained actual injury when the initial three-year annexation period expired and he could no longer automatically annex the new project to the apartment complex. "[W]hen malpractice results in the loss of a right, remedy, or interest, or in the imposition of a liability, there has been actual injury regardless of whether future events may affect the permanency of the injury or the amount of monetary damages eventually incurred." (*Id.* at p. 227.)

In light of the later decision in *Jordache, supra*, 18 Cal.4th 739, the Court of Appeal's conclusion that Foxborough had sustained actual injury well before losing the Daon litigation is unexceptional.[9] What is striking for our purposes, however, is that the appellate court did not hold there was actual injury when all documentation for the real estate transaction was completed in 1980 and Foxborough's right to automatic annexation was limited to three years (that is, it lost any right to annexation without time constraints). Rather, actual injury was first sustained in May 1983 when the three-year period for annexation had expired. As the court explained, "During the three-year period that Foxborough could have effected an automatic annexation under the pertinent regulation [citation], Van Atta's alleged negligence created only the potential for harm, because Foxborough could have proceeded with the development and annexation. But when the three-year period for automatic annexation expired on May 8, 1983, Foxborough lost the right it had retained Van Atta to secure." (*Foxborough, supra*, 26 Cal.App.4th at p. 227.)

So, too, in the case at bar, Gibson, Dunn's alleged negligence in drafting the succession and termination provisions in the partnership agreement created only a potential for harm prior to Oliver's death and the onset of Robert's purportedly disabling physical and mental condition. If Robert had survived Oliver's death and then died himself while fully engaged in managing Inge Realty Company as its sole general partner, paragraph 13.3(b) of the limited partnership agreement would have governed; and Sophia, Robert's surviving spouse, could have been elected as the successor general partner. In that event, the partnership would have continued on the same

---

[9] The Supreme Court in *Jordache* approved the analysis articulated in *Foxborough* and cited the case throughout its opinion, including to support the propositions that "[a]n existing injury is not contingent or speculative simply because future events may affect its permanency or the amount of monetary damages eventually incurred." (*Jordache, supra*, 18 Cal.4th at p. 754.) Justice Chin, the author of *Jordache*, wrote *Foxborough* while serving on Division Three of the First Appellate District.

terms and conditions as before, and Gibson, Dunn's alleged negligence in failing to provide a succession plan in the event of the retirement or incapacity of the surviving general partner would have never ripened into actual injury.[10] In effect, the Robert Inge family members would have been in the same situation as Foxborough had he effected an automatic annexation during the three-year period provided by the governing regulations. In both cases the fact future rights were compromised by written agreements constituted only contingent or speculative harm until such time as the absence of those rights had some meaningful effect. (See *Adams v. Paul, supra,* 11 Cal.4th at pp. 590–591 [citing case holding negligent preparation of trust documents did not cause actual damage until trust was challenged and plaintiffs were forced to pay legal fees to defend them for proposition that "actual loss of the underlying remedy may remain contingent, that is, the attorney's negligence may have created only the potential for future harm"]; see also *Fritz v. Ehrmann* (2006) 136 Cal.App.4th 1374, 1383 [39 Cal.Rptr.3d 670] [actual injury not sustained at time attorney negligently prepared second promissory note, which failed to specify that deferred interest was to be repaid at the end of the note's term; injury was "speculative at the time of the preparation of the note. . . . [The borrowers] might have paid the deferred interest in accord with the parties' original understanding without regard to any ambiguity in the second note."].)

Once Robert became incapacitated, however, paragraph 13.1 of the partnership agreement appeared to require dissolution of the limited partnership; and nothing in paragraph 13.3, which authorizes continuation of the partnership only upon the death of the surviving general partner, permitted his spouse to succeed him as a general partner or otherwise allowed the partnership to operate as a family-run enterprise. At that point—sometime in the first few months of 2004—the Robert Inge family members suffered actual injury as a result of Gibson, Dunn's allegedly improper preparation of the limited partnership agreement (see *Foxborough, supra,* 26 Cal.App.4th at p. 227 [actual injury was sustained when "Foxborough lost the right it had retained Van Atta to secure"]), even though the full amount of damages (assuming there was negligence at all) could not then be determined (see *Jordache,*

---

[10] As Gibson, Dunn argues, whether or not the limited partnership agreement could have been amended prior to Oliver's death in February 2003 does not affect the determination when actual injury first occurred. (See *Jordache, supra,* 18 Cal.4th at p. 750 [limitations period is not tolled because "the injury is, in some way, remediable"].) But unless the Robert Inge family members incurred legal fees to correct Gibson, Dunn's alleged drafting errors or the agreement's defective succession and termination provisions caused some other "manifest and palpable" injury (*Adams v. Paul, supra,* 11 Cal.4th at p. 589), until Robert ceased being an active general partner, thus triggering the dissolution provisions in paragraph 13.1, the firm's alleged negligence caused no "actual, existing injury" (*Jordache,* at p. 754). It was, at most, "[t]he mere breach of a professional duty, causing only nominal damages, speculative harm, or the threat of future harm—not yet realized . . . ." (*Budd v. Nixen, supra,* 6 Cal.3d at p. 200.)

*supra,* 18 Cal.4th at p. 744 ["The loss or diminution of a right or remedy constitutes injury or damage. [Citation.] Neither uncertainty of amount nor difficulty of proof renders that injury speculative or inchoate."]).

Even if Robert was not, in fact, disabled or incapacitated prior to his death on October 30, 2004,[11] the Robert Inge family members nonetheless suffered actual injury when Bank of the West, as Oliver's trustee, claimed his condition permitted it to force the dissolution of the limited partnership and the Robert Inge family members were required to incur attorney fees to respond to that claim. As in *Sindell v. Gibson, Dunn & Crutcher* (1997) 54 Cal.App.4th 1457, 1470 [63 Cal.Rptr.2d 594], "the mere fact of such litigation is the unwanted consequence" (italics omitted)—hence, the "actual injury"—for which the allegedly negligent lawyers are responsible.[12]

Our conclusion the Robert Inge family members first sustained actual injury either when Robert's disability triggered the dissolution provisions in paragraph 13.1 or when they incurred legal fees to respond to Bank of the West's attempts to terminate the partnership, not when the limited partnership agreement became effective in October 1988, is reinforced by the analysis in *Truong v. Glasser* (2009) 181 Cal.App.4th 102 [103 Cal.Rptr.3d 811]. In

---

[11] The Robert Inge family members disputed Bank of the West's claim that Robert was disabled or incapacitated; no judicial determination of his capacity to function as the sole general partner of Inge Realty Company was made prior to his death.

[12] In *Sindell v. Gibson, Dunn & Crutcher, supra,* 54 Cal.App.4th 1457, the law firm had been engaged to draft an estate plan for a client, which was intended to transfer his wealth to his daughters (the plaintiffs in the legal malpractice action) and for the benefit of his grandchildren. (*Id.* at p. 1460.) According to the allegations in the malpractice complaint, at the time the estate plan was being implemented, the client's current wife was willing to consent to the inter vivos gifts and transactions involved, acknowledging the interests being transferred were the client's separate property or, alternatively, waiving any community property interest in those assets; but Gibson, Dunn negligently failed to obtain the necessary documentation to confirm her agreement to the plan. As a consequence, three years later, after the wife had become mentally incompetent, her own children filed a family law action that sought to set aside the 1989 and 1990 transactions on her behalf and to hold the client and his children liable for a sum equal to the wife's purported community property interest in the transferred assets. (*Id.* at p. 1462.)

The client sued Gibson, Dunn for malpractice based on its failure to obtain the wife's consent. The trial court sustained Gibson, Dunn's demurrer on the ground the cause of action had not yet accrued because the client would only suffer "actual injury" in the event of an adverse judgment in the community property litigation. (*Sindell v. Gibson, Dunn & Crutcher, supra,* 54 Cal.App.4th at p. 1470.) Division Three of this court reversed the judgment of the trial court, holding that the malpractice action was not premature because the client sustained "actual injury" when the community property action was filed. (*Id.* at p. 1473.) "Where, as here, the purpose of a lawyer's retention is to place the client and his or her intended beneficiaries in a posture of quiet ownership of assets, and the lawyer negligently fails to obtain a simple written consent which would all but preclude costly litigation, *the mere fact of such litigation is the unwanted consequence.* The litigation represents the loss of the bargained-for benefit; the litigation itself is the event which constitutes damage." (*Id.* at p. 1470.)

*Truong* Vision Manufacturing, Inc., and its president Steven Truong (collectively referred to in the opinion as VMI), with the advice of VMI's attorney, Bruce M. Glasser, entered into a real property lease for VMI's manufacturing operation in late October 2005. Disputes about the condition of the property resulted in a lease addendum in December 2005, which resolved certain of the problems and contained a mutual waiver of claims. Still dissatisfied with the lessor's performance VMI sued the lessor in March 2006; new counsel, not Glasser, represented VMI in the litigation. Judgment was entered against VMI in August 2007, and the lessor was awarded more than $220,000 in attorney fees. (*Id.* at pp. 106–107.) VMI sued Glasser for malpractice in September 2007, alleging Glasser had been negligent in the advice he gave concerning the lease for the property and the lease addendum. (*Id.* at p. 108.) The trial court granted Glasser's motion for summary judgment, finding the malpractice action was time-barred. The Court of Appeal rejected VMI's contention it did not sustain actual injury until it lost the underlying litigation with the lessor and affirmed the trial court's order granting summary judgment: "Plaintiffs first sustained actual injury when they were required to obtain and pay new counsel to file a lawsuit seeking to escape the consequences of their signing the lease and Lease Addendum . . . ." (*Id.* at p. 114.)

In light of the parties' tolling agreements, it appears the exact date of actual injury in this case—whether when Robert became disabled (if he did) or when Bank of the West first sought dissolution of the partnership based on paragraph 13.1 of the partnership agreement—is immaterial. However, because "determining actual injury is predominately a factual inquiry" (*Jordache, supra,* 18 Cal.4th at p. 743), to the extent a question remains on this point, the matter is properly resolved by the trier of fact following remand.

> c. *Payment of Gibson, Dunn's Fees to Draft the Partnership Agreement, Without More, Is Insufficient to Trigger the Running of Section 340.6's Limitations Period*

As discussed, the second amended complaint alleges the Robert Inge family members have been damaged by Gibson, Dunn's negligent drafting of the partnership agreement, in part, by payment of attorney fees to the firm in 1988 for preparing the partnership agreement, which failed to include a provision for the continuation of the limited partnership except upon the death of both general partners. The pleading asserts, "Plaintiffs did not receive the legal documents that they sought from [Gibson, Dunn] and for which they paid legal fees to [Gibson, Dunn], . . . and but for the negligence of [Gibson, Dunn], this [(that is, an appropriate succession provision that anticipated the disability or retirement of the surviving general partner)] would have been provided in the [limited partnership] agreement." Gibson,

Dunn argued, and the trial court found, its legal fees constituted actual injury at the time incurred because, as a result of the firm's alleged negligence, the fees exceeded the value of the legal services provided.

■ The Supreme Court in *Budd v. Nixen, supra,* 6 Cal.3d at pages 201–202 recognized that fees previously paid to the defendant-attorney in a legal malpractice action, as well as fees paid to a second attorney to "compensate[] that attorney for his efforts to extricate plaintiff from the effect of defendant's negligence" may, in some circumstances, constitute damages recoverable in the malpractice action. As to the former category of fees, however, the court explained they would constitute actual injury only "to the extent that, in consequence of defendant's negligence, those fees exceeded the value of defendant's legal services." (*Id.* at p. 202, citing *Pete v. Henderson* (1954) 124 Cal.App.2d 487, 489–490 [269 P.2d 78] [fee paid to lawyer to appeal a judgment is proper item of damages in malpractice action based on lawyer's negligent failure to timely file the notice of appeal]; see *Ferguson v. Lieff, Cabraser, Heimann & Bernstein* (2003) 30 Cal.4th 1037, 1045 [135 Cal.Rptr.2d 46, 69 P.3d 965] [" 'an attorney's "liability, as in other negligence cases, is for all damages directly and proximately caused by his negligence" ' "]; see generally 3 Mallen & Smith, Legal Malpractice (2011) Damages, § 21.6, p. 24 ["[u]sually, the fees paid to the defendant-attorney bear no relation to the loss of the client"].)

Unlike fees paid for services that were never performed, however, the Robert Inge family members received substantial value from Gibson, Dunn's legal work—a limited partnership agreement under which Inge Realty Company successfully operated for several years. To be sure, as Gibson, Dunn argues in its brief to this court, "Had either of the two brothers taken the document to another attorney, that lawyer should have been able to say: 'Based on what you have told me, this is not what you want. I can draft an amendment to the agreement, but it will cost you $X.' In that situation, the injury would have been $X. It does not matter that we do not know what $X is. . . . [¶] . . . The measure of damage is the cost that would have been incurred to pay another lawyer to 'fix' the purported problem." That is, if Inge Realty Company or Oliver or Robert personally had incurred attorney fees to remedy the defects in the partnership agreement caused by Gibson, Dunn's drafting errors, those fees would be tort damages recoverable in a malpractice action and would constitute actual injury within the meaning of section 340.6(a). (*Jordache, supra,* 18 Cal.4th at p. 751; see *Sirott v. Latts* (1992) 6 Cal.App.4th 923, 928 [8 Cal.Rptr.2d 206] ["client suffers damage when he is compelled, as a result of the attorney's error, to incur or pay attorney fees"].) But no such remedial action was ever taken in this case, and the cost of amending the agreement was merely hypothetical, not "actual."

Of equal significance, if Robert had survived Oliver and then died himself while fully engaged in managing Inge Realty Company as its sole general partner, the succession provisions in the partnership agreement, whatever theoretical defects might exist, would have accomplished their intended result; and Inge Realty Company would have received full value for the legal fees paid to Gibson, Dunn. In those circumstances, in the words of the test articulated in *Jordache*, the client would not have been able to "plead damages that could establish a cause of action for legal malpractice." (*Jordache, supra*, 18 Cal.4th at p. 743.) It is not simply that the Robert Inge family members had not discovered the fact of injury in October 1988, as Gibson, Dunn argues, but rather that any potential injury based on overpayment of legal fees remained contingent or speculative until some further, future event occurred.

At a more fundamental level, it would effectively nullify the tolling provisions of section 340.6(a)(1) to construe the language in *Budd v. Nixen, supra*, 6 Cal.3d 195, suggesting payment of legal fees to an allegedly negligent defendant-attorney may be recoverable as malpractice damages as necessarily requiring a finding that actual injury has been sustained at the time such fees are first incurred. Legal fees for defective services will inevitably be "excessive": The client received less than it had agreed to pay for (that is, services performed with ordinary skill and knowledge). To equate these potential damages with actual injury would return California to a strict, occurrence-based limitations period for malpractice claims, contrary to the Legislature's express purpose in adopting section 340.6 (see *Jordache, supra*, 18 Cal.4th at pp. 748–749), and create the precise type of bright-line rule rejected by the Supreme Court in *Jordache* and *Adams v. Paul, supra*, 11 Cal.4th 583.

Although it is reasonable to presume the client has incurred, if not actually paid, legal fees and costs in virtually every case in which transactional malpractice has been alleged (and in cases of litigation malpractice, as well, except where the attorney represented the client on a contingency fee basis), Gibson, Dunn has not cited to this court—and we have not been able to locate—a single California appellate decision holding that actual injury was first sustained as a result of payment for legal services that exceeded the value of the services provided due to negligence.[13] After explaining that

---

[13] The language from the opinion in *Budd v. Nixen, supra*, 6 Cal.3d 195, relied upon by Gibson, Dunn and the trial court was paraphrased in *Jordache, supra*, 18 Cal.4th at pages 750 to 751, where the court observed, "In characterizing the latter fees as a type of damage that allows a malpractice cause of action to accrue, *Budd* simply recognized the established rule that attorney fees incurred as a direct result of another's tort are recoverable damages." (*Id.* at p. 751.) The *Jordache* court did not comment on the first portion of the quoted language from

excessive fees paid to the defendant-attorney or fees paid to new counsel to remedy the consequences of the defendant's negligence may be recoverable as damages, the Supreme Court in *Budd v. Nixen, supra,* 6 Cal.3d 195 remanded the case to the trial court to decide at trial or on a properly supported motion for summary judgment when the plaintiff had sustained actual damage. (*Id.* at pp. 203–204.) *Pete v. Henderson, supra,* 124 Cal.App.2d 487, cited in *Budd,* concerned the proper measure of damages for legal malpractice, not a limitations issue (and all parties conceded the fees paid to file the appeal were recoverable as damages following the lawyer's failure to timely file the notice of appeal). Similarly, the Court of Appeal in *Orrick Herrington & Sutcliffe v. Superior Court* (2003) 107 Cal.App.4th 1052 [132 Cal.Rptr.2d 658] recognized that fees paid to an attorney in excess of the legal value of services received are recoverable as contract damages, but did not address any question of actual injury or the tolling of the limitations period under section 340.6(a)(1).[14] There appears to be no other case that even discusses this language from *Budd v. Nixen.*

Not only is there no support in reported decisions for Gibson, Dunn's assertion that actual injury under section 340.6(a) is sustained when fees are incurred for negligently performed legal services, but also that contention is impossible to reconcile with the myriad cases that have struggled with the question when such injury has first occurred. For example, in *Sindell v. Gibson, Dunn & Crutcher, supra,* 54 Cal.App.4th 1457, the law firm had been paid more than $100,000 in 1989 and 1990 for its legal work in connection with the client's estate plan. (*Id.* at p. 1460.) The legal malpractice action sought to recover as damages, in part, the fees paid to Gibson, Dunn (because the services had no value), as well as the substantial attorney fees subsequently incurred to defend the validity of the estate plan, a defense made necessary by the law firm's failure to obtain the consent of the client's current wife to the property transfers involved. (*Id.* at pp. 1463–1464.) There would be no question the cause of action for legal malpractice had accrued when the lawsuit was filed if the original payment of fees to Gibson, Dunn constituted actual injury within the meaning of section 340.6(a)(1). Yet, as discussed in footnote 12, *ante,* the trial court's ruling was that the malpractice

*Budd,* and, as discussed below, did not find that fees paid to the negligent defendant attorneys constituted actual injury within the meaning of section 340.6(a).

[14] The *Orrick Herrington & Sutcliffe* court held fees paid to an attorney in excess of the value of the legal services received are contract damages, not tort damages for purposes of a legal malpractice action. The court noted, "both *Budd* and *Jordache* specifically identify fees paid to a second attorney to correct the first attorney's error as 'tort' damages" (*Orrick Herrington & Sutcliffe v. Superior Court, supra,* 107 Cal.App.4th at p. 1060, fn. 5), but omit the "tort" label from the claim for recovery of an overpayment in fees. "Although neither *Jordache* nor *Budd* explicitly so states, we believe it is evident that an overpayment for services is contract damages. . . . [W]ere the law to be otherwise, tort damages would exist in every instance an attorney collected a fee." (*Id.* at p. 1060, fn. omitted.)

action was premature; and the Court of Appeal reversed, explaining the purpose for obtaining a waiver-consent would be to render unlikely (or easy to defeat) a challenge to the client's implicit claim to sole and separate ownership of the assets to be conveyed. Accordingly, "the mere fact of such litigation is the unwanted consequence. . . . [T]he litigation itself is the event which constitutes damage." (*Sindell*, at p. 1470, italics omitted.) None of this analysis would have been necessary if Gibson, Dunn's gloss on the language in *Budd v. Nixen, supra*, 6 Cal.3d 195 were correct.

Similarly, if the payment of legal fees for negligent legal advice necessarily equates to actual injury within the meaning of section 340.6(a), the court in *Truong v. Glasser, supra*, 181 Cal.App.4th 102, would not have concluded the clients "first sustained actual injury when they were required to obtain and pay new counsel to file a lawsuit seeking to escape the consequences of their signing the lease and Lease Addendum" (*id.* at p. 114); and the court in *Fritz v. Ehrmann, supra*, 136 Cal.App.4th 1374 could not have held no actual injury was sustained when the negligent lawyer included ambiguous terms in an amended promissory note in 1995, but only when the debtor exploited that ambiguity and refused to pay the deferred interest in 2002 (*id.* at pp. 1386–1387). And in *Jordache* itself, the legal fees paid to the defendant legal firm, which negligently failed to advise the clients of their right to an insurer-funded defense, would have been sufficient to find actual injury without the need to describe the significance under section 340.6(a) of the millions of dollars in "unpaid insurance benefits for defense costs in the Marciano action and in lost profits from diversion of investment funds to pay these defense costs." (*Jordache, supra*, 18 Cal.4th at p. 752.)[15]

■ In sum, in the circumstances of this case, neither the payment of legal fees in 1988 to Gibson, Dunn for preparation of the allegedly defective limited partnership agreement nor the execution of the agreement by Robert and Oliver constituted actual injury; and the limitations period for filing a legal malpractice action against the law firm was tolled until Robert became disabled or Bank of the West asserted Robert's condition permitted it to

---

[15] As the trial court recognized in its order granting summary judgment, which rejected the Robert Inge family members' attempt to waive their claim for damages for attorney fees paid to Gibson, Dunn in 1988, whether or not the plaintiff seeks to recover an item of damages does not change the date actual injury is first sustained for purposes of section 340.6(a)(1). (See *Jordache, supra*, 18 Cal.4th at p. 750 [" '[a]ny appreciable and actual harm flowing from the attorney's negligent conduct establishes a cause of action upon which the client may sue' " (italics omitted)]; cf. *Bennett v. Shahhal* (1999) 75 Cal.App.4th 384, 392 [89 Cal.Rptr.2d 272] [" 'if the statute of limitations bars an action based upon harm immediately caused by defendant's wrongdoing, a separate cause of action based on a subsequent harm arising from that wrongdoing would normally amount to splitting a cause of action' "].)

dissolve the limited partnership, whichever first occurred. Accordingly, the trial court erred in granting summary judgment on the ground the malpractice action was time-barred.

### 3. *Gibson, Dunn Is Not Entitled to Summary Judgment on Its Alternate Theory of Lack of Proof of Loss Causation*

■ In the trial court Gibson, Dunn presented evidence it asserted established that the alleged drafting deficiencies in the partnership agreement did not proximately cause the settlement of the probate action initiated by Bank of the West. In particular, Gibson, Dunn's evidence indicated the Robert Inge family members first sought a settlement with Oliver's trustee and beneficiaries before any drafting errors were raised in the probate action. In addition, they asserted, based on testimony and documentary evidence, by the time a settlement was finally reached in November 2005, none of the risks associated with litigating the probate action was attributable to the claims relating to the succession or termination provisions in the partnership agreement. Accordingly, although the trial court did not rule on the causation issue, if we do not affirm the judgment in its favor on limitation grounds, Gibson, Dunn urges us to affirm on its alternate theory that the Robert Inge family members cannot prove loss causation. (See *Viner v. Sweet* (2003) 30 Cal.4th 1232, 1244 [135 Cal.Rptr.2d 629, 70 P.3d 1046] [to recover damages in a legal malpractice action, plaintiff must prove "that *but for* the alleged malpractice, it is more likely than not that the plaintiff would have obtained a more favorable result"]; see also *id.* at p. 1242 ["In both litigation and transactional malpractice cases, the crucial causation inquiry is *what would have happened* if the defendant attorney had not been negligent. This is so because the very idea of causation necessarily involves comparing historical events to a hypothetical alternative."].)[16]

Whatever merit Gibson, Dunn's loss. causation argument may have with respect to the financial terms of the settlement of the probate action, in their second amended complaint the Robert Inge family members also sought as damages all fees and costs, including attorney fees, incurred in defending the probate action, which necessarily encompasses legal fees related to claims regarding the dissolution of the partnership because of Robert's incapacity whether or not those claims ultimately impacted the final settlement. In opposition to the motion for summary judgment, the Robert Inge family

---

[16] The Robert Inge family members did not brief the causation issue, properly noting, pursuant to Code of Civil Procedure section 437c, subdivision (m)(2), that before we affirm an order granting summary judgment on a ground not relied upon by the trial court, "the reviewing court shall afford the parties an opportunity to present their views on the issue by submitting supplemental briefs." Notwithstanding this provision, we retain discretion to reject an alternate basis for affirming an order granting summary judgment without additional briefing from the party opposing summary judgment.

members submitted the declaration of Susan V.I. Callahan, who testified in part, "The Inge family entities involved in the litigation against Bank of the West, including Inge Realty Company, incurred substantial attorney's fees, as well as other losses, defending against Bank of the West's efforts to dissolve the Partnership, even after such time that Bank of West voluntarily dismissed all of its fraud allegations and relied solely on the Partnership Agreement as the means by which it sought to dissolve Inge Realty Company."

Although Gibson, Dunn apparently contests the accuracy of portions of this statement,[17] there is at least a disputed issue of fact whether the Robert Inge family members incurred attorney fees defending claims premised on Gibson, Dunn's allegedly negligent drafting of the succession and termination provisions in the partnership agreement. Fees paid to a second attorney to correct errors committed by a prior attorney represent damages recoverable in a legal malpractice action. (*Jordache, supra*, 18 Cal.4th at pp. 750–751 [attorney fees incurred as a direct result of another's tort, including professional negligence, are recoverable damages]; *Sindell v. Gibson, Dunn & Crutcher, supra*, 54 Cal.App.4th at p. 1470 [attorney fees incurred by estate beneficiaries in defending litigation that would not have occurred but for their prior attorneys' negligence are recoverable damages in their legal malpractice action]; *Orrick Herrington & Sutcliffe v. Superior Court, supra*, 107 Cal.App.4th at p. 1060 [fees paid to attorneys to correct prior counsel's errors recoverable as tort damages]; see also *Sirott v. Latts, supra*, 6 Cal.App.4th at p. 928.) Accordingly, whether or not the Robert Inge family members can ultimately prove their settlement of the probate action with Bank of the West and the beneficiaries of Oliver's trust would have been more favorable but for Gibson, Dunn's negligent drafting of the partnership agreement, they will establish both loss causation and damages if the trier of fact accepts their evidence that they incurred additional legal fees in defending that litigation as a result of Gibson, Dunn's errors. Summary judgment on this alternate ground would not be proper.

## DISPOSITION

The judgment is reversed, and the matter remanded for further proceedings not inconsistent with this opinion. Inge Realty Company, Susan V.I. Callahan, as trustee of the Robert E. Inge Children's Trusts (Trust No. 1), Sophia Inge,

---

[17] Gibson, Dunn objected to this entire paragraph in Callahan's declaration on a variety of grounds, including "assumes facts not in evidence" and "pleadings filed by Bank of the West speak for themselves." Noting that Gibson, Dunn's evidentiary objections failed to comply with the requirements of the California Rules of Court, the trial court declined to rule on them.

as trustee of the Robert Inge Family Trust, Sophia Inge and Susan V.I. Callahan, as co-executors of the Estate of Robert E. Inge, and Sophia Inge, individually, are to recover their costs on appeal.

Zelon, J., and Jackson, J., concurred.

Respondent's petition for review by the Supreme Court was denied August 10, 2011, S193532.